Number 11-1069, PPL Corporation. The Commissioner of the Internal Revenue is Ms. Tamami? Tamami. Tamami, okay. And Mr. May. Good morning. May it please the court, I'm Francesca Tamami, Counsel for the Commissioner of Internal Revenue. If it's okay, I'd like to reserve five minutes of my time for rebuttal. No problem. The issue in this case is whether the United Kingdom windfall tax qualified as a creditable income tax under Section 901 of the Internal Revenue Code. Now... Let me just see if I can get something from 10,000 feet here. You're thinking of the tax base here as a difference between valuations, is that correct? Correct. It's the imputed company valuation and the the flotation value and the flotation value. Is that the right way to look at it? It seems like you've got a logic chain here under the regulation and it combines the statutes terms and says income or profits and excess profit tax now are in a single concept called an income tax. The next part of the chain is a foreign tax is an income tax if and only if the predominant character of that tax is that of an income tax in the U.S. sense. It then provides that the tax has a predominant character of an income tax in the U.S. sense if the foreign tax is likely to reach net gain in the normal circumstance in which it applies and then goes on and says a foreign tax is likely to reach net gain in the normal circumstances circumstances in which it applies if and only if the tax judged on the basis of its predominant character satisfies each of the realization gross receipts and net income requirements. Correct. So it looks as if there are there was a there's a claim there's a windfall here and that that is on profits and you're saying that it just isn't or or or what what do you where where where do you disagree in that chain? Is it the last point or or where? Well I think that the commissioner's position is even though in if the reason for the legislation, the reason for the tax, even assuming that it was to capture what was perceived to be the excess profits of these companies, the regulation in determining whether this test is met requires you to look at the tax base. It requires you to look at how the tax is computed. That that language comes out specifically if you look at the last of those three tests, the net income test which is in But in the form it is set up, isn't corporate profits the only real variable? Well no, because each company had a different flotation value as well. So the profit-making value and the flotation value. If you take out the flotation value, is the corporate profits the only real variable? The only real variable in the sense that different companies had a different number of days in their initial period. But for the most part, right. However, the statute flotation value is a part of the formula under the statute. So what would be the basis for disregarding flotation value as a variable? Well it seems as if what they're as if that's sort of a number off to the side. And what they're focusing on, at least your opposing counsel, is just the profits here. And you're saying, no, it's a difference between the two. I understand that. And seemingly that's the way you think it's set up. But when you look at predominant character, which I think is what people are looking at, the predominant character they're saying is that of an income tax. And I think where you're strong is if you go on the three requirements, if they're actually met, especially the easiest one probably being gross receipts. But so be it. The, I mean, some of the problem Well, I guess some of the problem I'm having is with respect to what the tax court did, I'm not quite understanding its analysis. It cites post-83 cases, particularly Texas Gulf and the Second Circuit, from the Second Circuit, and I guess Exxon from the tax court, to argue that the pre-1983 holdings are consistent with the regulation. Is that how you read Texas Gulf? Well, the general principles from those pre-1983 cases in the sense that those cases said for a foreign tax to be creditable, it must look like a U.S. income tax. There were different tests at different times, whether it was the substantial equivalent of a U.S. income tax or had the predominant character of an income tax. So those test the idea that this needs to look like a U.S. income tax. Gross receipts, less allowable deductions, and the tax ultimately must be imposed on this net income figure. Those general principles from those cases are embodied in the 1983 regulations. But the preamble to the regulations, and also the Second Circuit made this clear in Texas Gulf, is that there's now a three-part test for determining whether that standard is met. The court cannot just decide to look at the world of evidence and decide, make a gut determination of whether this tax appears to reach net gain, whether it was intended to reach net gain. The regulation now has a three-part test that requires the court to look at the statutory tax base, to look at whether the foreign tax is imposed on the basis of gross receipts, less allowable expenditures. And I'm also leaving out the realization test, which, of course, is the first test that must be met. Which, in going to the tax court opinion, as far as I can tell, the only time they even mentioned it was in a footnote, 25. Correct. I think the court mentioned the three-part test elsewhere in its opinion early on in just discussing the relevant legal principles. But it certainly made no application of that three-part test. And actually, if you look later throughout its opinion, it sort of rephrased the regulatory test. It said the test is whether the tax was designed to and did, in fact, reach net gain. That's not actually what the regulation says. The regulation says it has to be likely to reach net gain in the normal circumstances in which it applies, and that test is met if and only if the three-part test is met. Judge Ambrose, I'd like to respond more to I think your concern that on maybe a general level, Parliament here was intending to reach excess profits. And also, if you look at pages, I guess it's 36 to 38 of PPL's brief, they're saying in the past there have been excess profits taxes and we've treated them as if they are creditable under 901. Why not here? Well, actually, I think PPL is saying that their mathematical reformulation looks like a historical U.S. excess profits tax. However, in terms of what the U.K., what has come before in terms of excess profits tax, first of all, Parliament enacted an excess profits tax in 1939. It was a World War II excess profits tax. The tax base was based on. Is that World War I? Correct. Sorry, World War I. You're right. It's all right. Well, it reached through 1946, actually. Okay. Okay. Sure. The base of the tax there was looking at these post-war, high post-war profits minus these lower pre-war profits. So that was clearly a tax on excess profits. There's no indication here. They haven't argued that the windfall tax is similar to that U.K. excess profits. I'd also point out that in 1980 the United States enacted a tax that was entitled windfall profits tax on crude oil production. This tax is actually discussed in the Phillips Petroleum case. And as the tax court discussed in that case, it was undisputed that that tax was not an income tax. There was an income component in measuring the windfall profits, but that was an excise tax. It was not an income tax. And that brings me back around to the fundamental point that even if on a general level the legislature is trying to reach excess profits, there are different ways that that can be done. The Anderson team here, it's in the record that they identified six different ways that the excess profits could be recaptured. You could also have a property tax. You could have an excise tax. But Section 901 and the regulations are clear that to be creditable it must be an income tax. And Section 901 is a matter of legislative grace. The regulations must be strictly construed. So if the foreign tax, even if on a general level it's intended to reach excess profits, the way in which the tax base ultimately is computed must resemble a U.S. income tax. It must be based on realized gross receipts, less allowable deductions. Let me ask you a question. You refer on page 31 of your brief to the regulations, example three in the regulation. And I have example three here before me. And what I don't quite understand is the fairness of it, I guess. It says country X imposes a separate tax on income from the extraction of petroleum. Under that tax, gross receipts from extraction are deemed to equal 105 percent of the fair market value of the petroleum extracted. Computation is designed to produce an amount that is greater than the fair market value of the actual gross receipts. Therefore, the tax on extraction income is not likely to produce an amount that is not greater than fair market value. I.e., if it's 5 percent over the fair market value, you don't get to deduct any of it? That may appear to be unfair, but the regulation, there's no question here, they have not, the taxpayer has not challenged the validity of the regulation. That is what the regulation provides. But, I mean, if I, you know, I owe a, I have tax of 100 and it comes out $105. Why don't I get to say, okay, the IRS or the regulation say you get to deduct $100, you just don't get to deduct the 5. Here it sounds like if you go $5 over, in my example, you get zero. Well, this is speaking not so much to the final tax number, this is speaking to whether that gross receipts element of the tax base is satisfied. So if the starting point for computing the foreign tax is based on a number that exceeds gross receipts, then yes, that tax fails the regulatory test. But what's the policy behind that? It needs to look like U.S. income tax. And so if the starting point for determining net income is greater than gross receipts. That's about as close as it gets. I mean, I can make, change the example, we can make it 101, and just because you go $1 over, you don't get to deduct any of it. Zero, according to this example. It may appear unfair, but ultimately at the end of the day, questions of equity don't enter into consideration of whether. But I'm asking, do you have any idea what the policy reason is behind it? Again, I think it goes back to the fact that it needs to be accredited, it needs to look, be like a U.S. income tax. The U.S. income tax starts with gross income. That's pretty darn close here. I mean, I guess if it's not horseshoes close, it doesn't count here is what you're saying. That's correct. And the regulation must be strictly construed. And I think by analogy, although I know you feel that that example is unfair to the taxpayer, I think by analogy that example actually really does apply here. Here we don't have a tax that was based on fair market value, but the tax base did begin when the profit-making value was nine times average annual profit. So that was the starting, the first number you used to compute the tax base. That number clearly was designed to produce an amount greater than gross receipts. You have nine times profits. So by analogy. That's an assumed number, right, in the formula? It's a statutorily defined number, correct. And I would point out as well that the windfall amount, so the starting number was nine times average annual profit. So clearly you've sort of violated the spirit of starting with gross receipts. You're starting with a number that's well in excess of gross receipts. Even when that number was reduced by flotation value to yield the taxable windfall amount, for 10 out of the 12 regional electric companies that were subject to the tax, that taxable windfall amount exceeded their total four-year profits for the initial period by a figure of about 100 million pounds. So the actual tax base to which the 23 percent was applied was a number greater than four-year profits, and therefore was necessarily a number greater than excess profits, which logically would be a subset of those total profits. So in terms of the actual effect of this tax, it was not imposed on a net income figure. It was imposed on a figure that was greater than net income  Now let me understand something, because I was perplexed by that illustration, that example three that's given. That means if a company in fact has more profit than what you claim the regulation permits, it can escape credibility? Well, I think one of the problems with the example, the reason that creditability is denied, is because the foreign country in imposing the tax is actually assuming that the taxpayer has gross receipts in excess of what the real fair market value is. So the foreign country is starting by taxing a number that is greater than perhaps the actual profits that the taxpayer realized. Well, I'm not at all sure that that has sunk in. I have the same problem that Judge Ambrose has with that. It does seem to me a completely arbitrary kind of example, that if a company makes more money, has more profits, that it is not going to have to pay anything to the United States. Under the example, if the tax base is computed in such a way that the gross income figure is designed to exceed what the taxpayer probably would really make, because the gross receipts figure is based on a number that is larger than fair market value, then yes, the foreign tax does not meet the creditability test. But even a penny? Again, the thing I don't understand is why you don't get the hundred cents, you just don't get the additional five. And I'm sorry again that I don't have a satisfactory answer for you, but the regulation has not been challenged as invalid or as exceeding the congressional authority. I understand that. I understand the regulation hasn't been. But I don't like to subscribe to something that doesn't make sense. And I must confess that I do not, I've been over that example three a dozen times, and it still doesn't make sense to me. And apparently Judge Ambrose indicated that he has a little problem with it as well. As do I, but has it ever been challenged? It's not an issue on this appeal. I understand that. And I understand that you're adhering just to the statute as it appears. What I don't understand is the implementation of it. And that whoever determines what the gross profits are, if there's a mistake in the gross profits, and as Judge Ambrose indicates, an extra dollar is put in it, does that deprive the United States Treasury of the entire amount of the tax that otherwise would have had? Well, if there's a taxpayer that falls under. It's just the opposite. It would be a deduction. Right. I'm sorry, and I see that I've exceeded my time. Should I respond? Okay. If a taxpayer falls under this example, then actually they will be paying U.S. tax, because they're denied the foreign tax credit. So the United States will receive tax on that taxpayer's income. Right. Now, we're not legislators, of course, so we have to deal with what we have. Has this been challenged before, and are you aware, is there something sort of in the offing that we might be interested in? No. To my knowledge, this regulation, the validity of this regulation has never been challenged. That hasn't come up in any of the cases certainly that are cited in this brief, or in this case that I've looked at. And the taxpayer here, of course, has not challenged the regulation. Under the Supreme Court's Mayo case, the regulation is entitled to deference, and it has the force of law in this case, whether or not it reflects the ideal policy. I wonder, depending on what happens here, if your friend will challenge it. We'll see. All right. Thank you. Thank you very much. Thank you. We'll get you back in rebuttal. Judge Angro, could we have a two-minute recess at this point? Absolutely. We'll take a five-minute break, please. Thank you. But I don't think the second example would meet the gross receipts requirement, would it? I don't believe it would, but the profits here are the profits that are reported on the company's accounts. There is no doublet. The analogy here is not apt. There is no increasing of the total profits. The total profits have already been determined during the first four-year period. So this is not a situation where you're doubling profits and then dropping the rate in half. The profits that are used here are the real profits. And after there's flotation, the only thing that's moving during the entire four-year period is profits. If you make too much profit, this tax bites into you. There's one company that did not have that. If you going back to example three, how would you distinguish that? And you say it's not relevant to this case. Why not? It's not relevant to this case because we're not increasing profits at all. The profits are the profits that are shown on the company's act. So the examples still extend as an example, even though I had problems with the fairness and I guess Judge Garth had the same problem. This is a bright line that the service is. I'm not going to defend the commissioner's regulation here. It's not an issue in this case. But it's a bright line, and I think if what's being taxed is more than 105 percent, it's a bright line that the commissioner's adopted. He's not going to give you the benefit of a credit here. He's going to give you a deduction instead. But that regulation is not an issue here, and there is no increasing of the profits here. The profits are the profits that have been shown on the company's books for the first four years. Perhaps the regulation should be worded somewhat better than it is in any event. When I read the regulation, it states that this computation is designed to produce an amount that is greater than the fair market value of actual gross receipts. Therefore, the tax on extraction income is not likely to produce an amount that is not greater than fair market value. Whoever drafted that should be taken to the woodshed. They ought to be shot. One or the other. But tell me something, Mr. May. Yes, sir. Judge Shigaris pointed out that in the tax court opinion, it is only in a footnote that the three-pronged test of the commissioner is referred to, and that the analysis, I think that he would probably also say, that the analysis does not comport with the kind of analysis that would be expected in light of the statute. If the tax court did not evaluate or analyze these matters in accordance with the statute, shouldn't we have that done? Your Honor, thank you very much for that question. I'd like to get off that regulation if I could. It's perfectly clear here that the profits used are profits that meet the three-part test. The commissioner, as I've told you in his reply brief, finally concedes that. We put in unrebutted testimony both from U.K. witnesses and from U.S. witnesses that that is the case. Moreover, in the Entergy case, Entergy asked for requested findings of fact on the three-pronged test. The commissioner did not object to those, and by Rule 151 of the tax court rules, the commissioner conceded those points. So the tax court had in front of it unrebutted testimony from PPL and concessions on whether the three-part test was met in the Entergy case. So the judge didn't spend a lot of time on the three-part test per se. He spends almost four pages describing the regulations, and the regulations really, of course, are focused on the three-part test. That's not what is at issue here. What's at issue here, where the judge spent most of his time, is what's the predominant character of this tax? There's no doubt that the profits used in this tax satisfy. But to meet, quote, predominant character, you have to meet the three tests, the realization, the gross receipts, and the net income. You do. And it's undisputed and conceded by the commissioner that the profits used here, that is the U.K. Companies Act profits, meet all three of those tests. Conceded by the commissioner that it meets all three tests? Indeed. That's what happened in the Entergy case. When Entergy asked for requested findings of fact directly in these points. When we get Ms. Tamami up on rebuttal, I'm not sure she agrees with that. That would be fine if she can avoid that. That would be terrific. But the testimony in our case is unrebutted. The commissioner offered no accounting testimony. We offered U.K. accounting testimony saying that we meet the three-part test, realization, gross receipts, and net income. And then we brought it across the Atlantic with Professor Maydew, and Professor Maydew said in a comparative, on a comparative basis, that U.K. and U.S. accounting principles, which is really what this three-part test is, are quite similar. Well, I mean, if, like, as you say, it's been conceded, wouldn't this have been a short opinion by the tax court? Like really short? Not really. I think that the court still was obliged, Your Honor, to find out what, to examine what the predominant character of this tax is. Profits clearly are, meet the standards of the regulation. But at each point in this regulation it says, set off by commas, according to the predominant character of the tax. And so the court felt obliged. We presented a great deal of evidence from the beginning to the end, a great deal of evidence that this was intended to reach profits. I mean, to some extent I almost look at it when it talks about predominant character and somebody saying, well, does it look, feel, you know, and seem like an income tax? But you've got three precise requirements that you have to meet, realization, gross receipts, and net income. And so looking and feeling I don't think gets you there. You said that the ---- Well, Your Honor, the evidence here is overwhelming that we meet that. We put on two expert witnesses to deal specifically with that. Well, you said, for example, earlier that there was no increase in profits in terms of what you reported. But here you've got this formula that multiplies it by 9, divides it by 1461, then multiplies it by 365. So in effect you've got profits are multiplied by about 9 over 4, aren't they? They are. And, Your Honor, that's precisely the point. We drop a footnote on this. This is kind of a nothing. If you take profits and you multiply them by 9 fourths, it's going to be more than the profits. That's just mathematically true. I didn't hear what you said. Repeat that. I'll do my best. It's just mathematically true that if you multiply profits that meet the three-part test, if you multiply it by 9 fourths, you will always have a number higher than profits. Can I ask you a practical question? I mean, did your client pay U.K. income taxes for this period? He did, right? That's correct. Just regular income taxes. And are you able to say whether they claimed a U.S. foreign tax credit for those income taxes? I'm able to say that a credit was available. Well, I mean, I wonder if it's fair or whether we should allow your client to claim both a foreign tax credit for income taxes and the windfall tax. Well, Your Honor, it's more than fair. If you're paying income taxes, you get a credit. And if you're paying excess profits taxes on that profit, you're entitled to a credit. That's why the statute reads income taxes are excess profits taxes. It's not unusual to find a tax on a base of income. And if your income is too high, too excessive by judgment of the legislature, there's going to be a tax on the excess as well, and you should get a credit for both. And that's what 901 does. Can you talk briefly about the legislative history? I can. It's clear that the labor government wanted an excess profits tax. They've always called it an excess profits tax. They were ramping up to the election. They didn't have the excess profits drafted. They went to Arthur Anderson and asked Arthur Anderson to draft the tax that, in fact, became a law. But I thought the Anderson team, and I think maybe Mr. Robinson, rejected a profits tax, or the concept of a profits tax, didn't they? They rejected it facially. What they wanted to do is basically show the reverse of that, and that's where you see the quote from Jeffrey Robinson's book that Chris Wales, who ultimately became the senior tax advisor to Gordon Brown, has this epiphany. Oh, let's not say that it's excess profits in relationship to valuation. Let's say that the profits were too high, or rather the valuation was too low, given the profits that were earned during that four-year period. That's just kind of two sides of the coin. He's just saying, I'm going to say it differently. The difficulty with that, and it was presentational, this is what it's testified to, is this. When all these privatizations were done, and this is in the record, when all these privatizations were done, the NAO, which is the counterpart to our GAO, went and examined whether everything was right with the flotations, including whether profits were maximized. And it concluded, with the exception of one, that's British Telecom, the first one in 1984. It concluded that profits had been, that rather the proceeds had been maximized. And so notwithstanding what the form of this statute is, notwithstanding the form of this statute, you cannot say that the utilities were sold too cheaply. The text of this statute is purely presentational. The substance of this tax is that it's an excess profits tax. Thank you. I would say one other thing, Your Honor. There is a change. Judge Quart, did you have a question? No. Sorry. Go ahead. There's a change of position by the Commissioner in this case. It's announced at page 23 of his reply brief. And he says, contrary to what was argued at the tax court level, extrinsic evidence can be admitted for purposes of determining predominant character. In the same breath, he sweeps away all of the evidence that the tax court considered the PPL offer, that we have in our brief to you, to this circuit, sweeps it all away and says it's not probative. I think that's absolutely breathtaking. But it explains something. And what it explains is why the Commissioner is on the light side of the evidence here. As a matter of fact, the evidence here is quite lopsided. The Commissioner handcuffed himself to the text of this statute. And as a consequence, he did not put evidence on to support his position. Now, on this profits question and whether we satisfy a three-pronged test, he didn't put on any accounting witnesses. We put on two, unrebutted, no questions asked. This accounts for the weight of the evidence that's apparent in Judge Halpern's opinion. It's a 62-page opinion. He heard two trials. He heard all of the experts. And he was active and engaged with all of these experts. Just in closing, it looks to me like what you're contending is that there is a 23% tax on 225% of profits, that that's equivalent to a 51.7% tax on 100% of profits. Is that correct? I don't think I would say it that way, Your Honor. If you don't mind, I would run through an example that might make this simple. And I'm going to use PPL-SWEB numbers. I might run over a moment, but I hope you'll indulge me. No problem. I hope you'll indulge me. Peter Lilly shortens this. You don't have to be a mathematician to understand what's going on. He says, and so did Sorrell Oosterhusen, who was the treasurer, the way you look at this tax is really very simple. If average profits exceed one-ninth of the flotation value in any year, there is tax on the difference between the two. And that the tax rate, the effective tax rate, is 51.7%. Let me explain through SWEB how that works. You need to know two things, and they're in the record. The profits for the four-year period, the taxable period, 306 million pounds. The flotation value is 295 million pounds. The average profits for the four-year period is 76 million pounds. One-ninth of flotation value is 33 million pounds. The excess, 43 million pounds, multiplied by a 51% effective tax rate is 22.5 million pounds. The taxable period is four years. You multiply that by four, and the answer is 90 million pounds. That's exactly what PPL SWEB paid. And that's the right way to look at this tax. All right. Thank you very much. You're quite welcome. Please. Ms. Damani has five minutes of rebuttal. So what about it? Did you concede the three-part test? We did not concede the three-part test with respect to the tax base, which is what's relevant here. I don't know that the commissioner ever formally conceded the three-part test with respect to the profits that were used to determine profit-making value. Now, those profits were based on the company's publicly reported profits from their financial statements. So there's not a dispute that those profits reported in their financial statements reflect realized net income. However, that was one element of the formula for determining the tax. The regulation requires the three-part test to be met with respect to the tax base. So profits were multiplied, average annual profit was multiplied by nine and then reduced by flotation value to yield the tax base. That tax base does not meet the three-part test. The taxpayer has never presented any arguments suggesting that that tax base meets the three-part test. And the tax court, in its opinion, certainly made no effort to explain how that tax base meets the three-part test. And that is what the relevant question is. Are the concessions, if any, made here the same as in the Entergy case before the Fifth Circuit? Entergy had the pleadings were slightly different, but the commissioner's position is the same in the two cases. And I just want to respond to a couple points. First, I think, Judge Ambrose, your example was directly on point in terms of a tax that would double profits. A tax rate applied to two times profits, not meeting the gross receipts test. And my opposing counsel several times said that there's no increase in profits here. You're looking at the reported profits. Well, the statute plainly shows that that's not the case. Average annual profit is multiplied by nine. So it is exactly the case that profits are being increased to determine the tax base. And there's been a lot of emphasis on profits, okay? But the profits here were used only to determine value. And as we argued in our brief, this is a common valuation technique. If you look at many state and local property taxes on commercial property, they determine the taxable value of the property based on the income that the property produces, the rental stream or the amount of income it might produce in the future. A rate of return is applied, a discount rate to reduce that to present value. The tax rate is applied to that value. Now, there's no dispute that those are property taxes. The fact that the value of the property is determined with reference to the income it produces does not convert a tax on that value into an income tax. And that's the fundamental difference between the windfall tax and some other type of tax directly imposed on profits. I don't know if you or the final example that Mr. May gave, can you run through that and say where it is that you veer from his analysis pertaining to whether this is a meets the gross receipts test, for example? Are you referring to that mathematical reformulation? The one he gave at the end. Okay. First of all, just to clarify, there's been suggestions here that that reformulation is what Parliament really intended to enact here and that it enacted the tax it did purely for presentational reasons. I'd like to point out that that reformulation did not come up until it was actually invented by the expert witness in the Entergy case. That reformulation came up for the first time in this litigation. So it came up on our side of the pond. Correct. There's no indication that it was in Parliament's mind. There's no indication that it was even in the Anderson team members' minds. So it's really a stretch to say that Parliament really wanted to enact this formula, but it felt like there were political problems and so it went with the formula that it did. My opposing counsel made reference to the statement of Peter Lilly at the parliamentary debate where he made a comment to the effect of, this tax is profits in excess of one-ninth of flotation value. And that sort of reference to one-ninth seems to sort of dovetail with this math formula. I would point out that the parliamentary debates of the statute are hundreds of pages long. I know you all received, I'm sure you were not happy to receive the very lengthy joint appendix, almost one whole volume of the debate. It wasn't so bad. We read them in tandem in Gregorian chant. Well, the fact that I actually read those myself at one point, the entire parliamentary debate. There was one snippet by Peter Lilly in the debate with respect to one-ninth of flotation value. And from that one snippet, the taxpayer would convert, would have this court judicially reform the statute. This court in the Jahinsky case, which is cited in our brief, condemned, using very strong language, the notion of cherry-picking from a floor debate to reform a statute. And that is, in essence, what the taxpayer is trying to do here. Unless the court has any further questions. No further questions. I would ask that the counsel would get together with the clerk's office and order a copy of the transcript sharing the cost. Again, I want to thank you for exceptional briefs, exceptionally well-prepared oral arguments and presented oral arguments, and thank you for being here today. Thank you very much. Take the matter under advisement and call the last case of the day.